BLANCHARD, J.
Plaintiff sues to be declared the owner of certain securities alleged to be held by the defendant bank, and prays for a decree condemning the bank to surrender the same to her, or, in default of so-doing, to pay her the sum of $58,000.00, averred to be the value of the securities.
She is a married woman — the wife of Abraham F. Marks. She avers their residence to be the City of New Orleans.
She declares she sues by authority of the court, her husband having refused his authorization.
The substantial averments of her petition are:—
That as testamentary heir of her first husband, Jacob Feitag, she acquired a large-amount of property, a part of which consisted of the securities sued for, and which she describes, being negotiable bonds of certain corporations domiciled in the City of New Orleans, and of the par value of $54,300.00.
That the bonds in question were in hex-possession and under her control at the time of her marriage to A. F. Marks, and after her marriage to him she retained the administration of her separate estate, including the bonds aforesaid.
That defendant bank, a Louisiana corporation, whose domicile is in New Orleans, came into the unlawful possession of the bonds on or about August 1, 1898, without any consideration therefor to her and without hex-knowledge or consent — her information being that it received the same as security for a loan made to her husband.
*662 That her husband was without right or authority to pledge her separate property, under her control and administration, to secure a debt of his own; that such pledge was void; that the officers of the bank well knew the bonds were not the property of her husband, that they were her property, and were aware that he was without right or authority to pledge or dispose of them.
That under the Louisiana law the wife is prohibited from binding herself for the payment of any debt of the husband, contracted before or during the marriage, and that the pledge of her property to the bank by her husband (the bank being aware the bonds were hers) came within the said prohibition and is void.
That as soon as she was informed the bank had possession of the bonds and claimed to hold the same in pledge, she demanded the restoration thereof to her, and warned the bank not to dispose of the same.
That the bank, notwithstanding this demand and warning, refused to surrender the bonds to her, and has, she learns, sold and disposed of the same for its own benefit and account.
Defendant, in its answer, gives the history of its acquisition as pledgee of the bonds and avers its possession of the same to have been lawful and in good faith, and without knowledge ,of plaintiff’s alleged ownership; that the loan of $55,000.00 which it made to A. E. Marks was an ordinary transaction of commercial business, made in flue course, and predicated upon the faith of his possession and apparent ownership of negotiable securities payable to bearer, and which were deposited by him as security for the loan.
It then specially denies that the plaintiff, at, before or subsequent to the date of the loan to A. E. Marks, was a resident of, or domiciled in Louisiana, and, in this connection, it is charged that her allegation of a Louisiana domicile was made for the purpose of claiming the benefit of the statute law of Louisiana, which forbids married women from becoming responsible for the debts of their husbands, or of the marital community, and which equally forbids the pledge of their separate property for such debts.
The bank then avers that plaintiff and her husband were, at the time of the transactions out of which this suit has arisen, citizens Of and domiciled in either the State-of Mississippi, or the State of New York.
It then sets up that the statutes of Louisiana enacted for the protection of married women are special, personal statutes intended to apply within the State only and for the benefit of married women in the State; that no such law, whether statutory or common, obtains in either Mississippi or New York; that under the laws of those States-married women possess and enjoy the same legal capacity with regard to pledging, mortgaging, or disposing of their property, or-contracting debts, or becoming security for the debts of their husbands, or third persons, as is possessed and enjoyed by a person sid juris; and that plaintiff’s knowledge of her husband’s possession of the bonds'sued for, and of the use he made of the' same, and her consent thereto, bind her, as. to third persons, in the same manner and. to the same extent that any person of full capacity and unrestricted powers of disposition would be bound.
The court a qua decided the issue thus raised in favor of the plaintiff and from this-adverse judgment defendant prosecutes this-appeal.
Opinion.
This action is predicated upon article 2398 of the Civil Code, which declares that the wife, whether separated in property from her husband, or not separated, cannot bind herself for him, nor conjointly with him, for debts contracted by him before or during the marriage.
It is settled jurisprudence in this State that laws, such as the one just referred to,, regulating the privileges and prescribing the disabilities of married women are “personal”' statutes, purely domiciliary in character, and do not operate to the benefit of married women domiciled elsewhere than in Louisiana. Augusta Ins. Co. v. Morton, 3 La. Ann. 417; Hyman, Lichtenstein & Co. v. Schlenker & Hirsch, 44 La. Ann. 108, 10 South. 623; Baer Bros. v. Terry, 105 La. 480, 29 South. 886; Roberts v. Wilkinson, 5 La. Ann. 372.
The question of domicile, therefore, is-crucial.
If the plaintiff were a Louisiana wife dur *664 ing the year 1898, at the time the business •dealings between her husband and the bank, of which she complains, took place, she may invoke the protection of Civ. Code, art. 2398, provided the facts of the case bring it within the scope or reach of that law.
If, on the other hand, she were not a Louisiana wife, if she and her husband were not then domiciled in Louisiana, if their domicile were in either the State of Mississippi, or the State of New York, as averred by defendant, she may not invoke the shield of the Louisiana law referred to.
Under the laws of Mississippi there is no prohibition against a married woman pledging or mortgaging her property for the benefit of her husband, or to secure his debts, nor restriction upon her rights to give her property to him for the purpose of its being so used; and in that State the pledge of the separate property of a married woman for the benefit of her husband, or to secure his debts, and whether pledged by her, or by him with her consent, is valid and legally binds her and her separate property so pledged in the same manner and to the same extent as if she were unmarried and in all respects a person of full capacity to contract.
The same is true, in all respects, of the State of New York. There the “wife” remains sui juris in all things relative to property rights. She may make contracts and sue and be sued as any other person. See Domestic Relations Law (being chapter 48, p. 3954, of the General Laws of New York) art. 111, §§ 20, 21, 23, 26—for which see Session Laws of New York for 1896, p. 215, c. 272.
And, it would seem, the New York wife may even have a domicile different from that of her husband. See In the Matter of Florance, 54 Hun, 328, 7 N. Y. Supp. 578; Am. & Eng. Enc. of Law (2d Ed.) vol. 10, p. 33.
The trial Judge held the Marks — husband and wife — to have been domiciled in Louisiana in the year 1898, and that Mrs. Marks, as a Louisiana wife, could invoke the protection of the Louisiana statutes.
We are not able to concur with our learned brother in this conclusion.
The pledge of the bonds to the defendant bank took place in the early part of August, 1898. The Marks (both of them) were then in New York and the loan of money was effected by letter and telegrams — Marks, the husband, drawing his draft for the $55,-000.00, with the securities attached, which draft the bank paid.
We hold it to be 'established by a full preponderance of evidence that Marks and wife were not domiciled in Louisiana in the year 1898, nor at any time from the end of that year to July, 1900, when the present suit was filed, nor since, so far as the record shows.
Abraham If. Marks and Anna E. Feitag were married in the City of New York on September 30, 1897.
Marks, the husband, was at the time a young man 28 years of age. He had lived always in New Orleans at the home of his father, Ferdinand Marks, and for some years prior to his marriage was engaged in the general insurance business in New Orleans, associated with his father under the firm name of Ferdinand Marks & Son. He never had any other dwelling place in New Orleans than the home of his father.
, There is that in the record which reveals that the father was averse to the marriage; that over its prospect estrangement between himself and his son developed; and that this estrangement became permanent by the consummation of the marriage.
The son left the paternal domicile in the summer or early autumn of 1897, and at or about the same time the firm of Ferdinand Marks & Son was dissolved — the father continuing the business alone and alone liquidating the affairs of the old firm.
The son, A. F. Marks, went to New York and there, as stated, married the plaintiff on the 30th of September, 1897. From that day to this, certainly to the end of the year 1900, he has remained a citizen of New York. And if not of New York, then of Mississippi, as will appear.
It seems certain that from and after the date of his marriage, certainly from and after the close of the year 1897, he ceased to be a citizen of Louisiana; he has never lived in the State; has never had a home or an establishment there or local habitation; has not been in business there; and whenever in the State it has been as a temporary sojourner, stopping at first one hotel and then another, always going back to New York.
The lady he married was a widow. Her first husband was Jacob Feitag. He died in *666 Deóember, 1892, at Ocean Springs, Jackson County, Mississippi. He with bis wife had lived there for years before his death, though, formerly, they had lived in New Orleans.
Ocean Springs was their domicile. Feitag voted there; his only establishment was there. He was a man of means and dying without children left, by last will, all of his property, wherever situated, to his wife, Anna If. Feitag (born Turner).
The place of confection of his will was Jackson County, Mississippi, and in it he declared himself a resident of that County.
The will was probated on the petition of the wife in Jackson County. She alleged herself to be a resident of that County.
Later a copy of the proceedings was brought to Louisiana, the Succession of Jacob Feitag was opened in the courts of the City of New Orleans, the will and its Mississippi probate recognized, and the widow sent into possession of all his Louisiana property as universal legatee under the will. This was in January, 1893. She maintained her residence and domicile at Ocean Springs, and was, therefore, a citizen of Mississippi at the time of her marriage to A. F. Marks in 1897.
Since their marriage, this husband and wife have had no other permanent establishment than that of the wife at Ocean Springs. They were not wont to live there, but occasionally repaired thither and sometimes remained weeks at a time. At other places, even in New York, they stopped at hotels for the most part.
The marriage in New York was a very quiet affair. No one appears to have been present except two female witnesses, doubtless called in by the officiating clergyman, who was an Episcopalian minister, and who was a stranger to the contracting parties.
They repaired to the church, or parsonage of the minister, and were married there.
The law of New York requires the clergyman, or magistrate, before solemnizing a marriage, to ascertain, among other things, the residence of each party, and declares that unless the facts he is to inquire about are personally known to him he must require them to be proved, and for this purpose may administer an oath to and examine the parties, which examination is to be reduced to writing and subscribed by the persons examined.
And he is to give a certificate of marriage to the parties, in which he is required to state, among other things, the name and place of residence of each party.
Provision is made for the presentation of this certificate to the clerk of the city or town in which the marriage is solemnized, or in which either party, resided at the time of the marriage, or resides when the certificate is presented, and the clerk is required to enter upon a book, among other things, the name and place of residence of the persons married.
When, therefore, A. F. Marks and Mrs. Feitag appeared before the New York clergyman and requested to be married, and he made inquiry as to who they were and where residing, they gave their names and declared the Cambridge Hotel, New York City, to be their residence, and he so entered it on the certificate.
And, later, due report of the marriage was made, as the law required, to the Department of Health, and there it was entered on the public records, giving the residence of the contracting parties at the Cambridge Hotel.
The plaintiff admitted on the witness stand that a certificate of the marriage was given her, but she could not produce it because of the fact that it was in her bank box in New York.
While she explains, anent the declaration of their residence at the Cambridge Hotel, that they were only temporarily stopping at the hotel, it is significant that they were not claiming to be residents of New Orleans, or of any other place than New York, and suggests intention or desire to be considered residents of New York, and intention is one of the elements going to establish domicile. To state it in its briefest form, a change of domicile is a ccomplished by a change of residence to a new place, combined with the animus manendi.
After the ceremony the parties returned to the Cambridge Hotel and within a few days thereafter the husband paid a visit to New Orleans “to inform his father of the marriage,” as the wife tells us. But the estrangement between father and son continued, per *668 haps was increased by the information of .the marriage, since it appears that it was just then, or just following his visit, that the formal dissolution of the firm of Ferdinand Marks & Son was publicly announced.
Marks very soon rejoined his wife in Ne'w York, and they made a bridal trip to Europe, returning in December, 1897, to New York, from whence they went to New Orleans and then to Ocean Springs, where they spent the Christmas Holidays. In January, 1898, they were back again in New York, and on the 18th of that month Marks was elected Vice President of the Manhattan Fire Insurance Company, and established an office at 45 Cedar street, New York.
. To accomplish this election of Vice President he had to become a holder of stock in the Company and this holding he acquired. Other than this connection with the Insurance Company he had no other employment, save that in the latter part of January he began speculating on the stock market of New York, in which he continued for the greater part of the year 1898.
lie began his speculations first through the house of Daniel Odell & Co., changing later to the house of Price, McCormick & Co., to whom he owed large sums for margins on his various ventures, and to secure which he made large deposits of securities. His wife knew of these speculations and assisted him in them by letting him have securities belonging to her to margin his accounts with the aforesaid firm.
The money he borrowed from defendant bank was used in his speculations. It went into the hands of Price, McCormick & Co. His losses were considerable; he was unable, in consequence, to redeem the securities he had pledged, and, hence, this suit.
Shortly after forming his connection with the Manhattan Insurance Company, Marks made a southern tour in its interest.
He does not appear to have maintained this connection very long. He sold his stock and gave up the Vice Presidency of the Company.
His wife, who had meanwhile returned from New York to Ocean Springs, having occasion to visit New Orleans, which City is ■only a. few hours! run by rail from Ocean Springs, stopped, at the - Cosmopolitan Hotel in New Orleans- on February 15, 1898, and registered as “of New York.”
She returned to New York about the 1st of April following, joining her husband there and remaining continuously until July.
She took with her all the securities, bonds, etc., which, up to that time, she had kept in a box in the vault of the Whitney National Bank in New Orleans, and on April IS, 1898, she and her husband rented, in their joint names, a box or vault in the Fifth Avenue Safe Deposit Co. of New York, to which, it seems, two keys were furnished, presumably one for each of the joint lessees. Certain it is that her husband had access to the box.
Into this box she deposited her securities, and thereafter kept them there, except as used by herself or her husband.
The box in the Whitney bank in New Orleans was surrendered, empty, on May 12, 1898, though the rent was paid to September 2, 1898. She had had this box for six or seven years.
Since the surrender of the Whitney bank box, up to the time of the trial of this cause, and, likely, until now she has kept her securities, valuable papers, etc., including her marriage certificate, in the bank vault rented in New York.
Thus was accomplished and completed the removal of her personal property from Louisiana to New York.
In the summer of 1898, the parties traveled around in the North; were at Saratoga, Long Branch, etc. They stopped at hotels registering always, it would seem, as “of New York.”
On August 18, 1898, they were back in New York City and registered at the Hoffman House as “A. F. Marks & wife, of New York,” in his own handwriting, and on November 25, 1898, he registered there as “A. F. Marks & wife, Ocean Springs.” It is shown that the ledger of the Hoffman House always bore him as from Ocean Springs, and that he .stopped there frequently and long during 1898 and 1899.
It will be observed the registry at the Hoffman House in August, 1898, as of New York was in the same -month that the deposit of the bonds (for which plaintiff now sues) was made to defendant bank.
*670 These parties, being people of means, traveled a good deal, making New York their general headquarters, and being there at first one hotel and another, and sometimes, it would seem, at'places other than hotels.
Wherever they went after their marriage the husband generally registered them as “of New York.” Once or twice only as of Ocean Springs. This continued through 1898, 1899 and 1900. Whenever the wife was traveling alone she registered as “of New York,” or as “of Ocean Springs.”
Never — not once — did they register any where as “of New Orleans.”
On September 30, 1898, Mrs. Marks, being alone, registered at the Cosmopolitan Hotel, New Orleans, as “of Ocean Springs.” On January 9, 1S99, she and her husband registered there as “Mr. & Mrs. A. F. Marks, Ocean Springs,” and the entry is in her handwriting.
On January 9, 1900, she registered again, at the same hotel as “Mrs. A. F. Marks of Ocean Springs,” while on March 9, 1900, and again on October 31, 1900, she registered (being alone) at the St. Charles Hotel, New Orleans, as “of New York.” One entry was “Mrs. A. F. Marks, New York;” the other was “Anna E. Marks, N. Y.” — both in her handwriting.
In between these later dates, being in New York with her husband, he, on August 20th, 1900, registered at the Victoria Hotel, New York, as “A. F. Marks & wife, New York.”
Then on October 12, 1900, he applied to the Register of Voters in New York City for registration as a voter in that City, and was so registered. The official certificate of registration shows that he gave as his residence No. 4, West 27th Street, New York, and declared that his length of residence in the State of New York had been three years, in the county three years and in the election district two months. It also shows that he gave New Orleans as his last place of residence and the State of Louisiana as his last place of registration as a voter.
It will be observed that giving his length of residence in New York at three years carried him back to October, 1897, and it will be recalled that he married in New York on September 30th, 1S97, giving, at the time, New York as his residence.
Following his registration as a voter in October, 1900, he appeared at the general election of November 6, 1900, at a precinct in the Thirteenth Election District, of the 25th Assembly District, of New York City, and tendered his ballot. His vote being challenged on the ground that he was a nonresident, he “swore in” his vote. The challenge was that he was a resident of New Orleans, or of Ocean Springs, Miss., and not of New York. He contested this, making answer that he was a resident of New York and had lived in the City of New York for three or four years, part of the time at the Hoffman House, part at the Savoy Hotel and at the Victoria Hotel, where he then resided. At the same time he took before the proper official the oath required by the law of New York of a voter whose vote is challenged, viz.: — that he was of full age, a citizen of the United States for 90 days, an inhabitant of the State of New York for the last preceding year, of the county for the last preceding four months and of the election district for the last thirty days.
On the showing thus made by Marks his vote was received.
It is shown that since his marriage in 1897 he has neither registered nor voted in New Orleans. Previously he had registered and voted there.
But this is not all. As heretofore shown, the bonds sued for came into the possession of defendant bank on August 2, 1898, and this suit was filed in July, 1900. On September 28, 1898, less than two months after the bank’s acquisition of the bonds as pledged, the‘plaintiff herein filed suit in the Circuit Court of the United States for the Southern District of New York against Price, McCormick & Co. of that City, claiming the identical bonds in controversy. In this connection it will be remembered that the first deposit of the bonds had been made to Price, McCormick & Co., and it was from their hands they went to defendant bank. In the suit in the U. S. Court aforesaid, one of the allegations of the bill was:—
“That the plaintiff is, and at all times herein mentioned was, a resident of Ocean Springs, in the County of Jackson, and State of Mississippi.” _
At the foot of the bill is this affidavit:—
“Annie E. Marks, being duly sworn, deposes and says: — That she is the plaintiff *672 herein; that she has read the foregoing complaint and knows the contents thereof; and that the same is true of her own knowledge, except as to the matter therein stated to be alleged upon information and belief, and as to those matters she believes them to be true.”
This suit was discontinued and withdrawn for some reason, and in December of the same year, represented by different counsel, a new suit, on the same cause of action and for the recovery of the same bonds, was filed in the same court, and in this second suit she again averred her.residence to be Ocean Springs, Mississippi, and that she was a citizen of the state of Mississippi, and to this and the other allegations of the petition she made oath as heretofore given.
The allegation of domicile in these suits was not made merely pro forma. It was necessary to be made in order to bring her suit in the Federal Court. If she were a resident of New York, she must needs sue Price, McCormick & Co. in the courts of that State. So she must claim a domicile in another State in order to get into the Federal Court. It is significant that she did not olaim Louisiana. If she were a resident of New Orleans then, as she. now asserts to have been the case, why not have claimed Louisiana as her place of domicile?
It would have answered as well as Mississippi to give the Federal Court jurisdiction, and it was just as easy to name Louisiana as Mississippi. But no — she and her husband were not then claiming Louisiana at all as their habitat, their home, their place of residence, or of domicile. <It was either New York or Mississippi, and so she chose to designate herself as of Mississippi, and thus, vest the Federal Court with jurisdiction.
It was not until failure of the litigation in the Federal Court in New York (the second suit there being also discontinued) that the Louisiana suit was undertaken, and when so undertaken, the legal exigencies required her to appear in the role of a Louisiana wife, and so she- alleged her domicile to be in Louisiana and not in Mississippi, where it had been averred to be when she sued in the U. S. Court in New York.
In face of the facts referred to and with which the record bristles, it is impossible to avoid the conclusion that A. F. Marks changed his place of residence from New Orleans-to New York at the time of, or just following, his marriage in 1897, and that his fixed intention, all through the years 1898, 1899 and 1900, was to make New York his domicile.
If his domicile were likewise his wife’s, under the familiar rule which obtains in Louisiana that the domicile of the husband is that of the wife, then she, too, was a resident and citizen of New York in those years. But if she had a domicile other than that of her husband (and as heretofore shown such seems to be permissible under the New York law), then Mississippi, which was the place of her residence prior to and at the time of her marriage, continued her domicile, and Louisiana never was.
The wife in her testimony endeavors to explain away the damaging effect to her case of the facts tending to show domicile in New York or Mississippi. But her explanations are plausible only at best. They cannot be accepted as sufficing to destroy the effect which the law attaches to acts and doings and things such as those pointed out and which, taken as a whole, undoubtedly establish the animus manendi as to domicile in New York so far as the husband is concerned, and in New York, or Mississippi, so far as she is concerned.
Nor is there that in the record which makes even probable that these parties, while going from Louisiana, or from Mississippi, to New York to live and go into business, preserved the animus revertendi.
The testimony found in the record to the effect that Marks, the husband, endeavored to obtain employment in New Orleans, does not do so. The employment he solicited was that of superintendent of the American Brewing Company in New Orleans — a place made vacant by the death of Beck, the superintendent. It seems to have been an important position and, doubtless, could Marks have obtained it, he might have been willing to change his domicile back to New Orleans from New York. But he did not secure the place.
Besides, this application was in November, 1898 — after the failure of his speculations in New York and after the date of the transaction by which defendant bank acquired the bonds as pledgee. His effort to obtain *674 the Brewery superintendency seems to have been a mere venture. It did not change his plans; he continued his intention and acts as to domicile in New York; he registered and voted in that State subsequent to the application.
So, too, with the testimony that the^wife spoke to a house furnisher in New Orleans relative to furnishing a house owned there, and mentioned that she thought of returning to New Orleans. This was after disaster had come from the New York speculations of her husband; after the date of the acquisition of the bonds by defendant. It was, besides, mere talk; it was not carried into execution; she did not furnish the house; she did not live in it; she did not return to New Orleans.
It may be that a man’s registering himself and wife at hotels as of such and such place may be insufficient in itself to fasten upon him acknowledgment of domicile there.
There is no claim of that kind here. But these repeated registerings of Marks and wife as of New York, or of Ocean Springs, through two or three years’ time, and never one time as of New Orleans, are certainly strong links in the chain of facts and circumstances which go to show that the intention of these parties was not to claim Louisiana as their domicile, and to make it apparent that New York or Ocean Springs was their place of residence.
Continuous, uninterrupted declarations, especially at times not suspicious, accompanied by the fact of residence, the removal of personal property and the exercise of political rights, establish a change of domicile. They show the abandonment of the old, and the transfer to a new residence animo manendi, and this effects a change of domicile. Succession of Steers, 47 La. Ann. 1551, 18 South. 503; Hindman’s Appeal, 85 Pa. 466; Shelton v. Tiffin, 6 How. 185, 12 L. Ed. 387; Kellogg v. City of Oshkosh, 14 Wis. 623; Story, Conflict of Laws, c. 3, § 47.
For the reasons assigned, it is ordered and decreed that the judgment appealed from be avoided and reversed and that plaintiff’s demand be rejected with costs against her in both courts.
BREAUX, J., dissents.